JOHN H. LANDINO, PRO SE
124 Rumson Road
Rumson, NJ 07760
Telephone:  (201) 560-2500
Email:     john.landino@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETTS

|  |  |
|---|---|
| JOHN H. LANDINO<br><br>　　　　Plaintiffs,<br><br>v.<br><br>MASSACHUSSETTS TEACHERS ASSOCIATION, John Does 1-10<br><br>　　　　Defendants. | DOCKET NO.: 1:20-cv-11392<br><br>**CIVIL ACTION**<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMEN PURSUANT TO FED. R. CIV. P. 56** |

Pursuant to FED. R. CIV. P. 56 and for the reasons set forth in the

accompanying memorandum of law, which is incorporated by reference hereby

moves for summary judgment in favor of Plaintiff and opposes summary

judgment for Defendant.

　Dated: May 4, 2022　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　By:  /s/ JOHN H. LANDINO
　　　　　　　　　　　　　　　　　　JOHN H. LANDINO, PRO SE

1

JOHN H. LANDINO, PRO SE
124 Rumson Road
Rumson, NJ 07760
Telephone:  (201) 560-2500
Email:      john.landino@gmail.com


**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DOCKET NO.: 1:20-cv-11392

JOHN H. LANDINO

                Plaintiffs,

    v.

MASSACHUSETTS TEACHERS
ASSOCIATION, John Does 1-10

                Defendants.

**CIVIL ACTION**

**MOTION TO RECONSIDER PURSUANT
TO MA.F.R.C.P. 59(E)**


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMEN PURSUANT TO FED. R. CIV. P. 56**


I.   **MATERIAL FACTS AND PROCEDURAL POSTURE[1]**

        Project Veritas (PV) is a conservative media entity with long standing reports

on and disputes with teachers' unions across the county. In 2010, PV produced at

---

[1] For purposes of judicial economy and for ease of reading, the material facts and procedural posture will be
combined, as there is substantial overlap given the nature of the case.

story called "Teachers Gone Wild About the New Jersey Education Association.".
During the 90 days Plaintiff worked at PV in 2014, there was no stories or
investigations involving any teachers' unions.

On March 7, 2014, Gawker published a libelous and erroneous article
smearing the Plaintiff followed shortly by Gawker filing for Bankruptcy for losing a
Defamation case. Gawker reported Plaintiff was a convicted felon for narcotics,
behind on tens of thousands in taxes and child support – erroneously portraying
Plaintiff as a repugnant individual. On the same day,, Plaintiff was finally awarded
full custody of his teenage daughters after a decade in Family Court trying to
protect them. Plaintiff also owed no Child Support. Plaintiff's last day of work at PV
was March 31, 2014, since this time until the present Plaintiff has had no contact,
connection, association, or affiliation with PV nor any employee. Plaintiff is not a
member or affiliated with any political entity or group.

In 2015, PV recorded the President of the United Teachers of Wichita
admitting to physically assaulting children in the classroom and being protected by
the union. This incident too resulted in a PV lawsuit also involving Ms. Lauren
Windsor and 27.   Democracy Partners (DP). In May of 2016, Plaintiff received a
full pardon for his 1993 Unclassified Felony conviction in Connecticut.

In May of 2016, Plaintiff petitioned the Gawker article authors via email to remove the defamatory content. The authors hired an attorney who refused to cooperate with my requests citing the company was still in Bankruptcy court. Democracy Partners (DP), American Family Voices (AFV) and Project Veritas Exposed (PVE) are powerful progressive liberal lobbying entities in Washington, D.C., whose clients include numerous teachers' unions. DP, AFV and PVE combined to publish political opposition research, documents, and websites for their clients about PV's activities and employees.

In 2017, DP filed a lawsuit against PV. Also, in the same year AFT filed a lawsuit against PV – both cases are ongoing at present. In 2018, PV won a lawsuit in Massachusetts District Court concerning the right to record public employees which would include Massachusetts teachers. At the end of 2018, Plaintiff finally paid back all tax arrears – all arrearage accumulated from Family Court post-divorce litigation from 2005-2018 costing Plaintiff over $250,000 in legal fees. DP and AFV had one of their comingled principles, Ms. Lauren Windsor, publish a website called Project Veritas Exposed - https://www.projectveritas.exposed/ approximately in June of 2018.

PVE's website content focused solely on PV and its employees and investigators which also included a profile about the Plaintiff: https://www.projectveritas.exposed/john-landino as was the case through the filing of the complaint in this matter. As per Ms. Lauren Windsor's court testimony on September 9, 2020, she states the Plaintiff PVE profile was published June 26, 2018. PVE's Plaintiff's profile cites an erroneous and libelous Gawker article portraying Plaintiff as repugnant individual, deadbeat dad, and tax scofflaw. However, the profile included an "Update" stating Plaintiff was no longer a convicted felon as of May 10th, 2016 – this "update" was done on June 26, 2018. The PVE Plaintiff profile also states my employment at PV ended in 2014.

In October 2018, DP and Ms. Lauren Windsor filed a complaint against PV with the Ohio Elections Commission which was dismissed. On June 21, 2019 the MTA published on their website a 15-page dossier about PV: https://massteachers.org/-/media/massteacher/files/conferences/nea-ra/project-veritas.pdf?la=en.

The PV dossier had libelous and erroneous information about the Plaintiff along with his picture and hyperlinks to his Facebook profile and the libelous and knowingly false Gawker article. The URL which the MTA posted the full PV 15-page

dossier contains a pathway to the stored file "massteacher" > "files" > "conferences" > "nea-ra" > "project-veritas" – this strongly indicates that the PV 15-page dossier was shared with the NEA, which is "the largest labor union and the largest white collar representative in the United States" and "it almost exclusively supports the Democratic Party."

PV dossier untrue statement #1 – Plaintiff… "often uses disguises and misrepresents themselves." PV dossier untrue statement #2 – Plaintiff is the "COO" of PV. PV dossier untrue statement #3 – Plaintiff is "People involved in right-wing undercover operations and organizations." PV dossier untrue statement #4 – Plaintiff is the "COO" of PV. PV dossier untrue statement #5 – on page 12 Plaintiff name printed "John Landino (COO, PV)" with text "COO" hyperlinked to the knowingly libelous Gawker article: https://gawker.com/james-okeefe-employes-a-convicted-felon-1538633934 6 page 12

The MTA, DP, AFV and Ms. Lauren Windsor all knew on or before June 26, 2018 that I was not a convicted felon but in an act of extreme malice and retaliation they collectively conspired to linked my name to the erroneous Gawker article which was still live on the internet for the public to see. The Gawker article was

removed from the internet in its entirety by the new owner of the Gawker property on March 30, 2020 after Plaintiff threatened legal action.

On April 29, 2020 Plaintiff filed a civil case against the MTA, DP, AFV and Ms. Lauren Windsor in Bergen County Superior Court of New Jersey. On July 17, 2020 Bergen County Superior Court dismissed the MTA from the suit for Diversity advising me to file against the MTA in Massachusetts. During the New Jersey court proceedings, the MTA admitted to posting the PV 15-page dossier on their website. MTA's counsel during oral argument admitted the MTA "had on its website a document created by an entity called Project Veritas Exposed."

MTA's counsel then responded to an email from the Plaintiff after the hearing deceptively stating he was sure who gave and wrote the PV 15-page dossier to them. Now a common theme emerges – a conspiracy to defraud the Plaintiff and the courts. In the New Jersey court proceedings, Mr. Ryan Leach, Esq., Deputy General Counsel of the MTA submitted an AFFIDAVIT but deceptively omits the origin and author of the PV 15-page dossier even though his counsel knows the author and origin.

Mr. Leach, Esq., appears to mislead the court again in #8 of his AFFIDAVIT stating the "MTA simply placed the Dossier on its website, which is generally

accessible to its membership and the Public." The troubling questions start to mount – the URL for the MTA's publishing of the PV 15-page dossier indicates it was used in coordination with its partner union, the NEA, at a conference(s) as well. If the MTA and the NEA collectively distributed the PV 15-page dossier, then Mr. Leach, Esq., has committed perjury – a crime. This is precisely why the Plaintiff added John Does 1-10 as the deception from the defendant is wide ranging and material.

In the New Jersey court proceedings, Ms. Lauren Windsor of DP and AFV submitted an AFFIDAVIT where she also deceptively tells the court other than the "[Plaintiff PVE] profile…readily available online" they have never "published or disseminated any statement of any kind referencing Mr. Landino." The MTA conspired with DP, AFV, Ms. Windsor and possibly the NEA and more to maliciously harm the Plaintiff as part of a larger political, ideological, and legal battle that has been raging continuously for over a decade.

Plaintiff's children attended high school in Massachusetts from 2017 through 2020 and were subjected to harm from the collective offenses intentionally committed to permanently destroy his reputation. Internet search engines placed the MTA PV 15-page dossier in the top selections when searching "John Landino",

creating irreparable harm to the Plaintiff, his family and business. Besides the strong possibility that the MTA distributed the PV 15-page dossier with the NEA, the website analytics for the dossier url will yield additional concrete data of the breadth of the distribution of their fraudulent statements about the Plaintiff.

This case had been going on for quite some time and several depositions have been taken. While Defendant would certainly like the court to ignore the statements made ay many of those depositions, there are numerous statements that were that support Plaintiff's arguments so strongly, that summary judgment can be granted for Plaintiff at this time.

The first deposition was that of Plaintiff's. (See Exhibit A – Deposition of John H. Landino.) The first evidence of damages was when Plaintiff was being questioned on his lack of representation:

> 16 Q. And why have the over 100 attorneys that
> 17 you talked to refused to take the case?
> 18 A. I can't afford an attorney because your
> 19 client defamed me publicly and made it impossible to
> 20 work in the field with which I used to work, and
> 21 nobody is willing to represent somebody who has been
> 22 falsely accused of being an undercover right wing
> 23 operative in a northeast court. In fact, many of the
> 24 attorneys told me that if they did represent me.
> 25 They felt there would be retribution or I would get
> 1 my -- I would have a difficult time getting my rights
> 2 to due process.

(See Exhibit A – Deposition of John H. Landino, pages 2 lines 16-25 to page 28, lines 1 and 2.) There were several examples where Plaintiff states how Defendant defamed him, and the next example of damages came a bit later, during this exchange:

> 16 Q. Did you -- after Project Veritas, did
> 17 you go to work for anyone else, besides DeathRow
> 18 Velo, in 2014?
> 19 A. Who in the world would hire me?
> 20 Q. So that's a no?
> 21 A. That is a huge no.
> (See Exhibit A – Deposition of John H. Landino, page 55 line 16-21). Then,

while opposing counsel was continuing to do their best to discredit Plaintiff, unsuccessfully, the next exchange occurred:

> 23 Q. Have you been made any contributions or
> 24 donations to Project Veritas?
> 25 A. After I was fired receiving full custody
> 1 of two young daughters with abhorrent defamation
> 2 hanging over my head, I'm going to contribute to
> 3 them? Absolutely not.
> 4 Q. Did you contribute or donate to them
> 5 before you left working there?
> 6 A. Absolutely not. I could barely afford
> 7 to take care of my own children.
> (See Exhibit A – Deposition of John H. Landino, page 57 lines 23-25 to page

58 lines 1-7). Then, a clear example of the damages is:

> 11 Q. So are you currently also self-employed?
> 12 A. I guess technically you can call it
> 13 that, but since 2019 to the present, the business

*14 that I worked blood, sweat, and tears to build and*
*15 make money is literally dead because of your client's*
*16 defamation.*
*17 Q. What company is that?*
*18 A. DeathRow Velo, and I have another*
*19 company called Phantom Entertainment, but that*
*20 doesn't really have any income. It just has an asset*
*21 of an intellectual property, a patent of a keyboard*
*22 and mouse system, which also your client interfered*
*23 with my ability to try to get some money in to help*
*24 my family in 2019 and 2020.*

(See Exhibit A – Deposition of John H. Landino, page 61 lines 11-24). Further

evidence of how Plaintiff has suffered from Defendant's actions are as follows:

*1 Q. Is the information in the resume true*
*2 and accurate?*
*3 A. Other than omitting Project Veritas,*
*4 yes.*
*5 Q. This resume does not list Project*
*6 Veritas. Correct?*
*7 A. No, it does not. It would just cause*
*8 more harm to -- to me and my family.*
*9 Q. Any other reason why you did not list*
*10 your employment at Project Veritas?*
*11 A. Yes, you know, people like your client*
*12 made a living off of publishing false information*
*13 about me which destroyed my status in the community,*
*14 and I'd just like to put it behind me and try my best*
*15 to take care of my kids. It's a normal, normal thing*
*16 to do.*
*17 Q. Any other reason?*
*18 A. I don't think so. I think that reason*
*19 is pretty good enough. Single dad with two kids,*
*20 you're now going to try to hurt yourself while you're*
*21 trying to get employment? No, I wouldn't do that.*
*22 I'm not going to do that.*

(See Exhibit A – Deposition of John H. Landino, page 64 lines 1-22). Then,

further details of the damage done by defendant was:

> 5 I got an introduction to somebody at Google who runs
> 6 the gaming department by a very close friend and
> 7 Google summarily and unprofessionally didn't even
> 8 respond to me, and your client had their document up
> 9 on the website for the world to see, and there's no
> 10 way on God's green earth Google with do business with
> 11 anyone associated with Project Veritas. They hate
> 12 Project Veritas. They suspend Project Veritas from
> 13 their platform. There's videos I believe of that
> 14 talking about trying to get Project Veritas off their
> 15 platforms. So yes, there isn't much to show anymore.

(See Exhibit A – Deposition of John H. Landino, page 79 lines 5-15). The next

exchange was based on a document presented to Plaintiff:

> 2 Q. What is it?
> 3 A. It's, like I discussed before, when
> 4 entities like your client defame me, besides removing
> 5 it from your own server, you have to go into -- into
> 6 the actual search engine optimization pieces. Each
> 7 search engine has to be done separately. You have to
> 8 go in and ask for them to remove those links and
> 9 the -- and any data associated with that.
> 10 Q. And is this document reflecting that you
> 11 did that with regard to the MassTeacher.org site?
> 12 A. Yes.

(See Exhibit A – Deposition of John H. Landino, page 83 lines 2-12). Then

another exhibit was presented:

> 11 (Whereupon, Exhibit 8 is marked for
> 12 identification.)
> 13

*14 BY MS. CROWLEY:*
*15 Q. Do you recognize this?*
*16 A. Unfortunately, yes.*
*17 Q. And what is this?*
*18 A. It's a document your client linked to*
*19 falsely accusing me of being a convicted felon.*
*20 MS. CROWLEY: Just for the record, I've*
*21 marked this document as Landino-545 through*
*22 Landino-550.*
*23*
*24 BY MS. CROWLEY:*
*25 Q. When was this article published; do you*
*1 A. Yes, absolutely.*
*2 Q. What is it?*
*3 A. It's, like I discussed before, when*
*4 entities like your client defame me, besides removing*
*5 it from your own server, you have to go into -- into*
*6 the actual search engine optimization pieces. Each*
*7 search engine has to be done separately. You have to*
*8 go in and ask for them to remove those links and*
*9 the -- and any data associated with that.*
*10 Q. And is this document reflecting that you*
*11 did that with regard to the MassTeacher.org site?*
*12 A. Yes.*

(See Exhibit A – Deposition of John H. Landino, page 82 lines 11-25 to page 83 lines

1-12). Then, Defendant's attorney finally went into the article in question:

*6 Q. How did you come to see it?*
*7 A. Well, besides it being published by your*
*8 client, it was published by oh, my God, dozens and*
*9 dozens of other liberal websites, social media,*
*10 thousands upon thousands upon thousands of*
*11 publications with the worst vial comments you would*
*12 see. You would think I was a pedophile with how I*
*13 was treated. So yes, I saw it everywhere, all the*
*14 time, for many many years.*

(See Exhibit A – Deposition of John H. Landino, page 87 lines 6-14). Following that

discussion, Plaintiff had a long discussion about the damages he suffered and got

understandably upset by the damages he was forced to suffer through from

Defendant:

> 15 Q. In 2014 when you first saw it published,
> 16 what did you do?
> 17 A. I spoke to my attorney who took my job
> 18 when I asked for help, and he told me, "Well, it's
> 19 life in the big leagues. You're going to have to get
> 20 over it."
> 21 Q. And what did you do?
> 22 A. I immediately filed for -- with
> 23 Connecticut for -- what do you call it? To get the
> 24 charge expunged, and I didn't know what else to do.
> 25 That was a very difficult time in my life. I had two
>
> 1 beautiful young girls that I was now responsible for,
> 2 that I had fought all my life to make sure they could
> 3 have a better life and they would be safe, and here I
> 4 am jobless with worldwide defamation. Yes, these are
> 5 liberal hack sites, but that your client, whose not a
> 6 liberal hack site, your client is an immensely
> 7 powerful Union that works side-by-side with the state
> 8 federal government and works with its entire
> 9 affiliate network across the country and the largest
> 10 teachers Union in the country, the MTA, to republish
> 11 this when they knew I was not a convicted felon, I
> 12 didn't owe any taxes, and I did not owe any child
> 13 support. I'm sorry again for raising my voice. What
> 14 I've had to go through with my kids since then is
> 15 unfathomable what your client and those folks did to
> 16 me.
> 17 Q. Focusing on 2014, the MTA did not

*18 publish or post this Gawker article then. Correct?*
*19 A. The MTA linked in their filings in their*
*20 e-mails internally and externally to this article*
*21 that says -- and I want to bring you back to that*
*22 first exhibit that you showed me with Project Veritas*
*23 Exposed John Landino. Somehow in 2018 without any*
*24 notification from me, the author of this purported*
*25 document, not the Gawker, but the one that you put*

*1 Project Veritas dossier that links to this article,*
*2 the author knew that I wasn't a convicted felon, and*
*3 where is the due diligence on your client's behalf to*
*4 look at the author's own work saying I wasn't a*
*5 convicted felon. You -- I'm sorry, Ms. Crowley. I*
*6 don't mean to yell at you. I just get upset, sorry.*
*7 Your client linked me to this knowing that I was*
*8 nothing of what this document states.*

(See Exhibit A – Deposition of John H. Landino, page 87 lines 15-25 to page 89 lines

1-8). Finally, the specific damages are delved into:

*20 "People involved with Project Veritas*
*21 often use disguises and misrepresent themselves."*
*22 Do you see that?*
*23 A. Yes.*
*24 Q. How is that defamatory?*
*25 A. Well, I never -- I never used disguises,*
*1 and I never misrepresented myself. I was an office*
*2 manager, COO, or whatever it is you want to call it.*
*3 I did not perform any journalism, and that, in*
*4 itself, is slander against what really is going on is*
*5 just journalism. These people and your client do not*
*6 want this company labeled as journalistic, as press.*
*7 They would rather slander it in any way possible*
*8 because, again, they do not agree with the opinions*
*9 or the content that this news organization is*

*10 publishing.*

(See Exhibit A – Deposition of John H. Landino, page 118 lines 20-25 to page 119

lines 1-10). Further details of the damages incurred then followed:

*13 Q. How does the statement that people*
*14 involved with Project Veritas often use disguises and*
*15 misrepresent themselves discredit you in the minds of*
*16 a considerable and respectable segment of society?*
*17 A. Because if you went back to my -- I*
*18 forget what exhibit it was. It was the one where you*
*19 pulled up the Project Veritas Exposed from the*
*20 screenshot of doing a search for John Landino, and*
*21 what happens in the internet is that the search*
*22 engines go and collect all the data on the name, on*
*23 the image associated with the name. You know, this*
*24 is big business, and this is what companies use to*
*25 market. Conversely, if it's used as a weapon to harm*
*1 people, it absolutely will destroy anybody's,*
*2 including my -- how I'm viewed in the community*
*3 because just from that one screenshot that -- not all*
*4 the other search engines, that's the first tag line*
*5 shown in the preview. So anybody who just looked for*
*6 me, my photo, my name, Phantom Entertainment,*
*7 DeathRow Velo would see that that -- your client is*
*8 posting that. What would anybody do, especially in*
*9 the Northeast, and these people are violently opposed*
*10 to conservatism in your own state. A young man, a*
*11 military age man punched and assaulted an elderly man*
*12 for wearing a red hat with white letters because it*
*13 was Trump. I mean, your client has to be fooling*
*14 themselves to think there's no harm in what they're*
*15 saying or doing because that's not the case. This is*
*16 designed to harm and destroy anybody associated with*
*17 this media company and with this press agency because*
*18 they just didn't like the opinions and the content*
*19 that they published.*

(See Exhibit A – Deposition of John H. Landino, page 119 lines 13-25 to page 120

lines 1-19). Then the damages were clarified:

> 22 Q. Did anyone ever say to you that they
> 23 would not do business with you because they saw the
> 24 look book?
> 25 A. That's not a proper way to ask the
> 1 question, and I'll explain why, that most people are
> 2 not going to confront you. They're going to turn
> 3 around and never ever talk to you again. There's no
> 4 explanation from all the years of my hard work where
> 5 I would get -- regularly get queries asking for art,
> 6 asking for new customers to suddenly drop off the
> 7 face of the earth from 2019 to today, even if we took
> 8 out the one year of COVID. This year is an explosion
> 9 of business for everybody. My business does not even
> 10 get an inquiry. I have one or two clients. They're
> 11 friends of mine. Everyone has left me in the last 24
> 12 months. Gone. So it doesn't have to be someone who
> 13 said, "Oh, geez, you know, you're a Project Veritas
> 14 guy. I'm not talking to you." They don't do that.
> 15 That's not how it works in the real world. They just
> 16 say, "Oh, my God, I'm not even going to entertain his
> 17 business or associate with him." That's not unusual.
> 18 That's normal. Everybody uses Google. Everybody
> 19 uses a search engine and say, "Hey, who is John
> 20 Landino? What's DeathRow Velo?" That's enough right
> 21 there to disqualify me.

(See Exhibit A – Deposition of John H. Landino, page 120 lines 22-25 to page 121

lines 1-21).  A  similar  question  is  asked,  and  once  again,  the  damages  are

elaborated on:

> 9 Q. Did anyone ever say to you that they
> 10 would not employ you because they saw the look book?

11 A. Again, that is -- the form of the
12 question is not proper because all it takes for an HR
13 person to do is do an instant Google search. They're
14 busy. They get thousands of applications. They may
15 sort through some and say, "Oh, John Landino looks
16 like good sales guy. He's got a pretty decent
17 resume. Before I go any further, let me just poke
18 his name into Google to see what happens." Most
19 people have staff dedicated to this, and it ends up
20 in the garbage. And no, I will never know, but it's
21 not hard to understand that 200 applications I gave
22 you, many of which I'm more than qualified for, never
23 resulted in one offer. The only reason I have an
24 offer now is because nobody wants to work retail
25 because of COVID, and I'm the only person who is
1 willing to risk his life and his family's life to
2 support because I have no other options.

(See Exhibit A – Deposition of John H. Landino, page 120 lines 9-25 to page 123 lines

1-2). Further elaboration was made on the damages incurred:

> *9 Q. Do you know anyone who specifically saw*
> *10 the look book on the MTA site?*
> *11 A. Other than like people close to me,*
> *12 probably not, but that, again, doesn't impact damages*
> *13 because it's on every search engine. Whether I know*
> *14 it or saw it or heard it, it doesn't do -- it doesn't*
> *15 make any difference. Your client did what they did*
> *16 negligently, and I know you're trying to minimize*
> *17 what they did or minimize my damages, but they're --*
> *18 anybody who looked for me was going to preview that.*

(See Exhibit A – Deposition of John H. Landino, page 134 lines 9-18). Then through

a substantial remainder of the deposition, Plaintiff details his personal travails as

Defendant's counsel attempts to get a rise out of him as much as possible. To some

extent, she succeeds in getting him upset due to the incredibly personal nature of the case, but beyond that, does not undermine his case in any way. The same cannot be said about the other individuals deposed though, who largely undermine Defendant's arguments in numerous ways.

Next Plaintiff took several depositions of representatives of Defendant, as well as one representative of the NEA. The first deposition was of Sarah Nathan. (See Exhibit B – Deposition of Sarah Nathan) She made several statements that were beneficial to Plaintiff.

> *20 Q Yes. The defamation is related to a publication.*
> *21 Whose publication are you referring to?*
> *22 A A document that was produced by the NEA.*
>
> *(See Exhibit B – Deposition of Sarah Nathan, page 7 lines 20-22).*
>
> *4 A Can you just define "published"?*
> *5 Q Publish is the distribution or posting of a*
> *6 document.*
> *7 A The document was produced by the NEA or related*
> *8 parties and hosted by the MTA.*
> *9 Q Okay, so posting something on the internet as*
> *10 you're internet -- that's your job with the MTA.*
> *11 Posting a document on the internet is, in fact,*
> *12 publishing a document, correct?*
> *13 MS. CROWLEY: Objection.*
> *14 A Depends. Different interpretations, I guess.*
> *15 Q The document we're talking about right now is the*
> *16 Project Veritas 15-page dossier. Is that*
> *17 correct?*
> *18 A Yes.*

*19 Q Okay. And did you post that publicly on the MTA*
*20 website with an individual URL?*
*21 A Yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 8 lines 7-21).*

*9 Q So you published a 15-page dossier with my name*
*10 and many others without knowing the author?*
*11 A I know the, you know, the -- I know, you know,*
*12 where the document came from if that's your*
*13 question.*
*14 Q Where do you think the document came from?*
*15 A It was sent from the NEA to the MTA.*
*16 Q So still going back to my question, you published*
*17 a document not knowing who the author is on a*
*18 public URL. Is that correct?*
*19 MS. CROWLEY: Objection.*
*20 A Not entirely.*
*21 Q Sure. Then who is the author of this 15-page*
*22 document? Not where it was sent from, who is the*
*23 author?*
*24 A It came from a reputable source. It came from*
*1 the NEA.*
*(See Exhibit B – Deposition of Sarah Nathan, page 9 lines 9-24, page 10, line 1).*

*18 Q What does "Tips For Protecting Yourself" mean?*
*19 What do you need to be protected from?*
*20 MS. CROWLEY: Objection.*
*21 A General guidance for MTA members attending the*
*22 NEA RA in 2019.*
*23 Q Okay, did you attach this PDF to that page?*
*24 A Yes.*

*1 Q A few minutes ago, I asked you if you attached or*
*2 published this dossier to a separate non-public*
*3 URL for internal use for membership and you said*

*4 "No." Do you want to correct the record?*
*5 MS. CROWLEY: Objection. You're*
*6 mischaracterizing her testimony.*
*7 Q Did you publish the Project Veritas 15-page*
*8 dossier to this URL?*
*9 A Yes.*
*10 Q Okay. And this email was sent to you by*
*11 Ms. Hiemenz-Woodbury?*
*12 MS. CROWLEY: Objection.*
*13 Q Who sent this email to you?*
*14 A Well, it says it right up there. I mean, you see*
*15 it.*
*16 Q Okay, but just tell me who sent the email to.*
*17 A Mary Gilgallon.*
*18 Q Okay, and she received this email from*
*19 Ms. Hiemenz-Woodbury, is that correct?*
*20 A I don't know that. I mean, I received it from*
*21 Mary.*

*(See Exhibit B – Deposition of Sarah Nathan, page 12 lines 21-24, page 13, lines 1-21).*


*2 Q Yes. This email here is a part of the original*
*3 email from the NEA to their affiliates, which*
*4 include the MTA. Have you ever been in the*
*5 possession of or seen this email?*
*6 MS. CROWLEY: Objection.*
*7 A So this email was sent to me.*
*8 Q Okay. That's what I'm asking. So you --*
*9 A Yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 14 lines 2-9).*

*Q But you did publish this publicly and internally*
*10 on two separate URLs for the MTA?*
*11 MS. CROWLEY: Objection.*
*12 Mischaracterizes her testimony.*

*13 A I posted it.*
*14 Q Internally and externally, is that correct?*
*15 MS. CROWLEY: Objection.*
*16 Go ahead.*
*17 A I posted it once.*
*18 Q Okay. Let me go back to our original question.*
*19 Did you post the Project Veritas*
*20 15-page dossier through this URL, which says,*
*21 "Events and Conferences NEA RA Tips For*
*22 Protecting Yourself"?*
*23 A Yes.*

*(See Exhibit B – Deposition of Sarah Nathan, page 15 lines 9-23).*

*2 Q Did you post the 15-page Project Veritas dossier*
*3 to the public URL on the MTA public website?*
*4 MS. CROWLEY: Objection. Asked and*
*5 answered.*
*6 A Yes, yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 16 lines 2-6).*

*3 Q Does the State of Massachusetts, to your*
*4 knowledge, have cyber bullying laws?*
*5 A I believe so.*
*6 Q Okay. Does the State of Massachusetts, to your*
*7 knowledge, have laws about unauthorized entering*
*8 school premises?*
*9 MS. CROWLEY: Objection.*
*10 A Ask the question again, please?*
*11 Q To your knowledge, does the State of*
*12 Massachusetts have laws about an individual*
*13 seeking to enter a school premises unauthorized*
*14 or by fraudulent means?*
*15 MS. CROWLEY: Objection.*
*16 A I believe so.*
*(See Exhibit B – Deposition of Sarah Nathan, page 24 lines 3-16).*

*2 Q Yes. There are accusations of unlawful activity*
*3 in this document. So I'm wondering, have you or*
*4 anybody that you know at the MTA made any reports*
*5 to law enforcement concerning the dossier or the*
*6 exhibits I'm showing you?*
*7 MS. CROWLEY: Objection.*
*8 A I don't believe so.*
*(See Exhibit B – Deposition of Sarah Nathan, page 25 lines 2-8).*

*11 A I publish a lot of documents. I did not -- as a*
*12 webmaster as a poster, my job is not to*
*13 investigate. I'm a little unclear on the*
*14 question, but, you know, that's my answer.*
*15 Q Who gave you permission to publish this document*
*16 internally and externally on the MTA website?*
*17 MS. CROWLEY: Objection.*
*18 A Who gave me permission?*
*19 Q Yes.*
*20 A I was asked to post the document by*
*21 Mary Gilgallon.*
*(See Exhibit B – Deposition of Sarah Nathan, page 30 lines 11-21).*

*2 A I have the same answer. I was asked to post the*
*3 document by Mary Gilgallon, who is Director of*
*4 Governance.*
*(See Exhibit B – Deposition of Sarah Nathan, page 31 lines 2-4).*

*18 Q Is this the URL you used to post the Project*
*19 Veritas 15-page dosser, public version of it?*
*20 A Yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 35 lines 18-20).*

*17 Q It was accessible through two URLs. That's a*
*18 reasonable estimation --*
*19 A Correct.*
*(See Exhibit B – Deposition of Sarah Nathan, page 36 lines 17-19).*

23

*2 Q Let me try to make it little easier.*
*3 This link was operational during the*
*4 entire duration that the MTA had posted or*
*5 published the 15-page Project Veritas dossier?*
*6 A Yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 38 lines 2-6).*

*A I'm going to go back to an earlier answer, which*
*7 was I received the data from the Director of*
*8 Governance who asked me to post it.*
*(See Exhibit B – Deposition of Sarah Nathan, page 39 lines 6-8).*

*5 Do you know who Ryan Leach is?*
*6 A Yes.*
*7 Q Does he still work for the MTA?*
*8 A Yes.*
*9 Q He's an attorney, correct?*
*10 A Yes.*
*11 Q Is this a correct statement, that the MTA simply*
*12 placed the dossier on its website which is*
*13 generally accessible to its membership and the*
*14 public?*
*(See Exhibit B – Deposition of Sarah Nathan, page 40 lines 5-14).*

*22 Q How would the delegates know to look at that*
*23 page, then?*
*24 A The delegates are told where they are. It's not*
*1 --*
*2 Q But how are they told? Was it a mass email? Was*
*3 it done through Teams Chat? Like, what --*
*4 A That's actually handled by our Governance*
*5 Division.*
*6 Q Okay.*
*7 A So I'm not aware of the vehicle.*
*8 Q Okay, but a vehicle, to your knowledge, was used*
*9 to direct members who are attending the NEA RA to*

*10 that --*
*11 A Correct, a small group of members.*
*(See Exhibit B – Deposition of Sarah Nathan, page 40 lines 22-24, page 41 lines 1-11).*

*6 Q But anybody who was a member, the 110,000*
*7 members, if they wanted to, had access to look at*
*8 the internal posting of the Project Veritas*
*9 dossier on the Tips To Protect Yourself URL?*
*10 A If they were aware of its existence, yes.*
*11 Q Okay. But there was no restriction put on it, it*
*12 was a live public link just to the membership,*
*13 correct?*
*14 MS. CROWLEY: Objection.*
*15 A Yes, it was a public link.*
*(See Exhibit B – Deposition of Sarah Nathan, page 42 lines 6-15).*

*23 Would it cause someone harm to publicly*
*24 publish any type of document or information that*
*1 they were falsely convicted of a crime?*
*2 MS. CROWLEY: Objection.*
*3 A Theoretically, yes.*
*4 Q I agree, unfortunately.*
*(See Exhibit B – Deposition of Sarah Nathan, page 47, lines 23-24, page 48, lines 1-4).*

*6 Q But is it damaging to an individual to post*
*7 anything that would relate to a crime or a*
*8 conviction if it was not true?*
*9 MS. CROWLEY: Objection.*
*10 A So I think you did ask that right before we took*
*11 a break.*
*12 Q Yes, just answer one more time. Thank you.*
*13 A Sure. Theoretically, yes.*
*14 Q In the MTA' strive for accuracy, publishing a*
*15 document saying that I was a convicted felon of*
*16 narcotics when I was not, in your opinion, would*

*17 that harm me?*
*18 MS. CROWLEY: Objection.*
*19 A I think, again, theoretically, yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 49, lines 6-19).*

*24 Q If you republished a document without*
*1 verifying its accuracy and there are parts of*
*2 that document that are untrue, is that*
*3 negligence?*
*4 MS. CROWLEY: Objection.*
*5 A Theoretically, yes.*
*6 Q I agree. Thank you.*
*(See Exhibit B – Deposition of Sarah Nathan, page 51, line 24, page 52, lines 1-6).*

*8 Q do you think this would disturb a child --*
*9 MS. CROWLEY: Objection.*
*10 Q -- if they read this about their parent?*
*11 MS. CROWLEY: Objection.*
*12 A Theoretically, yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 53, lines 8-12).*

*18 A The question is, did anyone from the MTA contact*
*19 you -- did myself or anyone --*
*20 Q Anyone or you. That's it, and I'll move on from*
*21 this.*
*22 A Correct. The answer is no.*
*(See Exhibit B – Deposition of Sarah Nathan, page 55, lines 18-22).*

*19 A I'm not sure what you mean by "simultaneous," but*
*20 we're a state affiliate of the NEA.*
*21 Q Correct. The MTA members are also simultaneous*
*22 members of the NEA, correct?*
*23 MS. CROWLEY: Objection.*
*24 A Yes.*
*(See Exhibit B – Deposition of Sarah Nathan, page 56, lines 18-24).*

The second was James Sacks. (See Exhibit C – Deposition of James Sacks). He

also made several statements in favor of Plaintiff.

> *2 Have you read the Project Veritas*
> *3 15-page dossier?*
> *4 A Yes, I have looked at it.*
> *5 Q You've looked at it. When did you first look at*
> *6 it?*
> *7 A I believe it was April 1st, on the day that I was*
> *8 alerted to your complaint, your governance.*
> *9 Q Okay. But prior to that time, you never reviewed*
> *10 the document?*
> *11 A I don't remember ever seeing it.*
> *12 Q Thank you.*
> *(See Exhibit C – Deposition of James Sacks page 9, lines 2-12).*

> *18 Do you know, have you at any time*
> *19 contacted me to verify the veracity of the*
> *20 15-page dossier?*
> *21 A I have not ever contacted you or met you before*
> *22 or interacted with you.*
> *(See Exhibit C – Deposition of James Sacks page 10, lines 18-22).*

> *6 Q Mr. Sacks, were you in possession of or aware of*
> *7 the original NEA email that was sent to the MTA*
> *8 which includes --*
> *9 A I believe so.*
> *10 Q Have you seen it?*
> *11 A I've seen what you have on your screen.*
> *12 Q But you've never seen this before?*
> *13 MS. CROWLEY: Objection.*
> *14 A I've seen what you have on your screen before,*
> *15 yes.*
> *(See Exhibit C – Deposition of James Sacks page 11, lines 6-15).*

*14 Q Okay, was the Project Veritas dossier posted on*
*15 multiple MTA web pages?*
*16 MS. CROWLEY: Objection.*
*17 A My understanding was that it was one, but if you*
*18 have other information.*
*(See Exhibit C – Deposition of James Sacks page 15, lines 14-18).*

*6 Q To the best of your knowledge, did you or anyone*
*7 else in the organization have any evidence that I*
*8 was the actual COO of Project Veritas during the*
*9 time of publication?*
*10 A I have no way of knowing what other people knew.*
*11 Q But you personally had no knowledge whether I was*
*12 the COO of Project Veritas?*
*13 A I personally had no knowledge of anything about*
*14 you.*
*15 Q Is it fair to say that "people involved in right*
*16 wing undercover operations in organizations" is a*
*17 negative term?*
*18 MS. CROWLEY: Objection.*
*19 A That is in the eye of the beholder.*
*20 Q Does the MTA or you have any proof that I'm a*
*21 person involved in right wing undercover*
*22 operations or organizations?*
*23 MS. CROWLEY: Objection.*
*24 A I have no knowledge of whether the MTA has*
*1 evidence that you are involved in said things.*
*2 Q But you personally also do not have any*
*3 evidence that I'm involved with right wing*
*4 undercover operations or organizations,*
*5 correct?*
*6 A Yes, that is correct.*
*7 Q Thank you.*
*(See Exhibit C – Deposition of James Sacks page 20, lines 6-24, page 21, lines*
*1-6).*

*8 Q Okay. Is it fair to say that publishing false*
*9 information about a person being convicted of a*
*10 crime or not is damaging to an individual?*
*11 MS. CROWLEY: Objection.*
*12 A I have no knowledge of whether the information*
*13 published was true or false.*
*(See Exhibit C – Deposition of James Sacks page 22, lines 8-13).*

*5 A I don't know the status of your legal background*
*6 or anything else about you.*
*7 Q Okay, well, that's part of what this case is*
*8 about. If you didn't know the status -- would*
*9 you term the publishing of this document, then,*
*10 if it was unvetted or unverified as negligent?*
*11 MS. CROWLEY: Objection.*
*12 A That would be speculative based on what I've*
*13 already answered in your response to your*
*14 question.*
*15 Q Is it negligent not to do your due diligence to*
*16 research documents that are being posted with*
*17 information about dozens of people, not just me,*
*18 to see if it's verifiably true?*
*19 A I have no knowledge of the verification*
*20 procedures that apply for the documents.*
*(See Exhibit C – Deposition of James Sacks page 23, lines 5-20).*

*12 Mr. Sacks, but the document that your*
*13 organization published linked to another document*
*14 that was not true, and it was taken down in its*
*15 entirety, but at any time even after I had*
*16 contacted you, did you look and check at where*
*17 the links were going to for my name?*
*18 MS. CROWLEY: Objection,*
*19 A I did not.*
*(See Exhibit C – Deposition of James Sacks page 24, lines 12-19).*

*12 A Again, you're calling for me to draw conclusions*

*13 about your background and facts that I have no*
*14 knowledge of whether they're true or false.*
*(See Exhibit C – Deposition of James Sacks page 26, lines 12-14).*


*22 A Again, I can't -- I don't know the answer to*
*23 that. You're asking me to look at third-party*
*24 documents that are presumably the responsibility*

*1 of the organization that produces them to that.*
*(See Exhibit C – Deposition of James Sacks page 26, lines 22-24, page 27, line 1).*


*10 Q Speaking of that, to the best of your*
*11 recollection, when did you turn these documents*
*12 over to your attorneys?*
*13 A I believe it was shortly after mid May, maybe May*
*14 18th.*
*15 Q Of what year?*
*16 A Whatever year you call this. It was 2020, I*
*17 believe.*
*(See Exhibit C – Deposition of James Sacks page 30, lines 10-17).*

The third was Jessica Hiemenz-Woodbury (See Exhibit D – Deposition of Jessica Hiemenz-Woodbury). She also made several statements that are beneficial to the Plaintiff. The entire length of pages 14-17 is crucial. (See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 14-17, lines 1-3).

*A I don't remember emailing any particular*
*3 attachment, but I do remember emailing*
*4 Mary Gilgallon an email from NEA.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 19, lines 2-4).*

*10 Q Do you know who the author of this 15-page*
*11 dossier is with the pictures?*
*12 A NEA? I don't know. Did it come from NEA? It*
*13 came from NEA. I thought they did it.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 20, lines 10-13).*


*2 Q Do you remember what you wrote?*
*3 A I don't remember, but I can read it.*
*4 Q Can you read it back to me, please?*
*5 A (Reading):*
*6*
*7 "Courtney forwarding this to you,*
*8 updated from NEA to Project*
*9 Veritas, so we have it for*
*10 future events to model off when*
*11 creating signs, verbiage,*
*12 etcetera."*
*13*
*14 Q So did you did you read any of these documents in*
*15 these five attachments?*
*16 A I don't recall. It wasn't in my directive. I*
*17 was support staff. I got the emails from NEA*
*18 with the coordinator and I forwarded them to the*
*19 directors.*
*20 Q That's not what this says, though. It says this*
*21 is specific towards Project Veritas.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 21, lines 2-20).*


*10 Q What other events would they have used these*
*11 documents for that you didn't read, I guess?*
*12 MS. CROWLEY: Objection.*
*13 A TPL coordinates, like, summer conference.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 22, lines 10-13).*

*13 A I didn't believe anything. It's my scope to get*
*14 emails from NEA, our parent association, and*
*15 forward them to directors of the MTA and they can*
*16 do whatever they want with them.*
*17 Q So these are all the attachments you forwarded,*
*18 which were five attachments.*
*19 Do you have any knowledge or evidence*
*20 that I was a member or anybody involved in right*
*21 wing undercover operations or organizations?*
*22 MS. CROWLEY: Objection.*
*23 A Other than this document, no.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 23, lines 13-*
*24).*

*7 A I am to pass on anything from NEA.*
*8 Q Do you remember this email, Ms. Hiemenz?*
*9 A Yes. Now that I see it, yes.*
*10 Q Oh, now that you see it, okay.*
*11 This email has five attachments,*
*12 correct?*
*13 A Mm-hmm. Yes.*
*14 Q Is this third time you've distributed the five*
*15 attachments that you can recall now?*
*16 MS. CROWLEY: Objection.*
*17 A I've seen three emails now that you've shown me.*
*18 So yes, I can see it three times.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 24, lines 7-*
*18).*

*4 Q But you made a statement of fact that these are*
*5 pictures of staff?*
*6 MS. CROWLEY: Objection.*
*7 Q Did you make a statement of fact that these are*
*8 pictures of staff? Yes or no.*
*9 A I guess at some point when I opened up that*
*10 Lookbook, it looked to me like they were people*
*11 that worked for Project Veritas.*

*12 Q But I thought it wasn't under your scope of work*
*13 to look at documents and analyze them?*
*14 MS. CROWLEY: Objection.*
*15 Mischaracterizes her testimony.*
*16 A I wouldn't say I analyzed it.*
*17 Q What knowledge did you have that at the time you*
*18 sent this email that I was actually a member of*
*19 the staff of Project Veritas?*
*20 A Any knowledge about anybody for Project Veritas*
*21 came through this document.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 25, lines 4-21).*

*2 Q Did you contact me to verify that I was a member*
*3 of Project Veritas?*
*4 A No.*
*5 Q But you stated here that these are pictures of*
*6 staff, correct?*
*7 A I mean, that's what I wrote in the email, yes.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 26, lines 2-7).*

*6 Q But when the case started, did anybody ask you*
*7 about your communication involving the Project*
*8 Veritas Lookbook?*
*9 MS. CROWLEY: Objection.*
*10 A I don't know when this case started. I've never*
*11 even heard of you up until, like, three weeks*
*12 ago.*
*13 Q Did anybody ask you for any emails associated*
*14 with Project Veritas, your management or*
*15 attorneys?*
*16 MS. CROWLEY: Objection.*
*17 A No. I don't even have access to my MTA email.*
*18 Q Okay. So when this case was filed almost a year*
*19 and a half ago, nobody came to you to interview*
*20 you about how the documents came into your*

21 possession and how you forwarded them internally?
22 MS. CROWLEY: Objection.
23 A Nobody talked to me. Like, I didn't even know
24 about this case until a couple weeks ago.
(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 27, lines 6-
24).


7 Q Do you have any knowledge that I ever used
8 disguises or misrepresented myself?
9 A No.
10 Q Do you have any knowledge at the time of your
11 forwarding those emails that I was the current
12 CEO [sic] of Project Veritas?
13 MS. CROWLEY: Objection.
14 A All I knew at the time was what was in those
15 documents.
16 Q But did you have any personal knowledge of where
17 I worked, what I was doing?
18 A No.
19 Q Okay, so at the time, you did not have any
20 personal knowledge as I was the CEO of Project
21 Veritas -- COO, correct?
22 A Outside of this document, no.
23 Q Okay. So you relied on the veracity of the
24 document to make your statements?
1 MS. CROWLEY: Objection.
2 A If you're referring to when I refer to it as
3 "staff" --
4 Q Yes.
5 A -- I relied on this document.
6 Q Okay. Thank you.
7 Did you have any personal knowledge
8 about me personally being involved in right wing
9 undercover operations and organizations at the
10 time you forwarded that email, stating I was part
11 of the staff?
12 MS. CROWLEY: Objection.

*13 A Any personal? No.*
*14 Q Thank you.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 29, lines 7-24, pages 30, lines 1-14).*

*23 Q Correct, but you stated that I was part of the*
*24 staff because you believed the document was true,*
*1 correct?*
*2 A It was to the best of my knowledge at the time.*
*3 Q Yes, that is what I'm asking.*
*4 When did you leave the MTA, Ms. Hiemenz?*
*5 MS. CROWLEY: Objection.*
*6 A August 21.*
*7 Q At your exit interview, were you ever interviewed*
*8 about the the case or the information that you*
*9 distributed that's part of this case?*
*10 MS. CROWLEY: Objection.*
*11 A No, not at all.*
*12 Q Not one attorney came to you and asked you for*
*13 any correspondence involving the Project Veritas*
*14 15-page dossier?*
*15 MS. CROWLEY: Objection.*
*16 A The only attorney that I've ever spoken to about*
*17 this is Carolyn.*
*18 Q Okay.*
*19 A That was just in the last couple of weeks.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 30, lines 23-24, pages 31, lines 1-19).*

*4 For the internal use for your 100,000*
*5 members, in getting ready for the NEA RA*
*6 conference, are you aware if those five documents*
*7 that the NEA sent you was published anywhere*
*8 internally for the members of your former*
*9 employer?*
*10 MS. CROWLEY: Objection.*
*11 A With the RA, there's usually a password-protected*

*12 -- I thought a secure protected portal for the*
*13 delegates. And if it was published, it would*
*14 have been there.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 33, lines 4-*
*14).*

*8 Q It's not to the public. This one was just for*
*9 the RA, and I believe this -- URL here, does this*
*10 ring a bell?*
*11 A No, because that doesn't look like it's*
*12 password-protected.*
*13 Q So it was published on a public forum internally*
*14 for union members?*
*15 MS. CROWLEY: Objection.*
*16 A I don't know. I don't know that link. I'm not*
*17 on that email. Like, that happened outside my*
*18 knowledge.*
*19 Q All right, but you don't believe this was*
*20 password-protected, this URL, correct?*
*21 MS. CROWLEY: Objection.*
*22 A I mean, it's a link. It looks like you click on*
*23 it and you see something, so...*
*24 Q Yes, I agree.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 34, lines 8-*
*24).*

*3 Q Did you ever seen me attempt to get into any MTA*
*4 or NEA RA event?*
*5 A No, I don't remember seeing your face. No.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 45, lines 3-*
*5).*

*21 A The only other communication that could be is*
*22 that before the RA, NEA puts on, like, a little*
*23 pre-con meeting with all the coordinators in the*
*24 room to prepare for the convention and they go*
*1 through a bunch of different things, so NEA could*

*2 have mentioned in that pre-con, "Everybody, we*
*3 sent you documents. Make sure you take a look at*
*4 them."*
*5 Q They sent that to you or to someone else at the*
*6 MTA?*
*7 MS. CROWLEY: Objection.*
*8 A No, this was a live meeting.*
*9 Q I'm sorry?*
*10 A This is not anything that was sent. I'm saying*
*11 that this communication -- I could have been in a*
*12 meeting where they mentioned these emails.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury pages 45, lines 21-*
*24, pages 46, lines 1-12).*

*10 A This is not anything that was sent. I'm saying*
*11 that this communication -- I could have been in a*
*12 meeting where they mentioned these emails.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury, pages 46, lines 10-*
*12).*

*3 When you went to the preliminary NEA*
*4 meeting, who else do you believe attended that?*
*5 If you could just tell me what it was for and who*
*6 would normally attend.*
*7 A So it's hosted by NEA staff, mostly the event*
*8 staff, people involved with all the logistics to*
*9 the convention.*
*10 Q Yes.*
*11 A And then all the state coordinators. So usually*
*12 one or two of us from each state attended.*
*13 Q Correct.*
*14 A And it goes on for about three hours, I think.*
*15 Q Okay. And at that meeting, they did remind*
*16 people, or did they distribute these documents?*
*17 A No. I can say I don't know. Your question was,*
*18 can you recall a time where they might have there*
*19 might have been more communication.*

20 Q Okay.
21 A And I'm saying at that meeting they could have
22 referred to this, but I that's all I can recall.
23 I can't say for certain that it was talked about.
(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury, pages 47, lines 3-
23).


3 Were any of these documents printed and
4 handed out or available?
5 A Handed out, no. I think, to the best of my
6 knowledge, but you know, I can't recall for
7 certain, that we as the event internal staff may
8 have printed a copy out to have at our
9 registration desk to refer to if needed, but I do
10 not remember it ever being handed out to any of
11 the delegates.
(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury, pages 48, lines 3-
11).

2 Q Okay, so you had a printout of the Project
3 Veritas dossier just for your own union members?
4 MS. CROWLEY: Objection.
5 A Just for event staff, my colleagues and I.
6 Q Okay.
7 A Not for the delegates. I do not remember
8 anything printed out for the delegates.
9 Q But it was digitally sent to the delegates,
10 correct?
11 MS. CROWLEY: Objection.
12 A I don't know. I wasn't part of the email
13 communications.
14 Q And who had custody during this time of that
15 Project Veritas dossier during the event?
16 MS. CROWLEY: Objection.
17 A Ummm.
18 Q Just the person at the desk, whoever was sitting

*19 registering people? That's kind of what I'm*
*20 asking.*
*21 A Yes, that's where it would be. Like, in a*
*22 folder.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury, pages 49, lines 2-22).*

*11 A Just I have a memory having a document with me at*
*12 one of the Ras.*
*13 Q Okay, that's fine.*
*14 A But I don't know if I printed it or if I brought*
*15 it or whatever. I just remember having a*
*16 document on the registration table.*
*17 Q Yes, and it's fair to say that somebody at the*
*18 MTA printed it and brought it, whoever that may*
*19 be.*
*20 MS. CROWLEY: Objection.*
*21 Q Correct?*
*22 MS. CROWLEY: Objection.*
*23 A Yes, somebody printed it. I just don't know who*
*24 that was.*
*(See Exhibit D – Deposition of Jessica Hiemenz-Woodbury, pages 49, lines 11-24).*

These depositions alone show enough facts to support Plaintiff's claim for defamation. The fourth was Mary Gilgallon (See Exhibit E – Mary Gilgallon) and the last was Kimberly Dominguez (See Exhibit F – Kimberly Dominguez). Their depositions are also attached and replete with numerous statements that benefit Plaintiff. Once again **all** of these depositions show strong statements in favor of Plaintiff and support the defamation claim.

All of these depositions, as can be seen, shows that Defendant knowingly, willingly and intentionally defamed Plaintiff. Further, Plaintiff has suffered substantial physical harm as well. (See Exhibit G). Additionally, Plaint was pardoned as of May 10, 2016. (see Exhibit H). This was publicly verifiable information that Defendants simply failed to review, and instead chose to defame me and cause incalculable damage to Plaintiff, his family and his reputation. Finally, it is worth noting, and important for the court to understand, that Plaintiff owed nothing to the IRS, and he also has had sole custody of his child for years (See Exhibits I and J). These were also verifiable facts had Defendant chose to do so. They clearly did not, as it did not fit their narrative.

## II. **LEGAL ARGUMENT**

### a. **Summary Judgment Legal Standard**

Summary judgment is warranted if the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Uncle Henry's, Inc. v. Plant Consulting Co., 399 F.3d 33, 41 (1st Cir. 2005) (quoting Fed. R. Civ. P. 56( c)). A fact is material so long as it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is warranted only if a

reasonable jury could not return a verdict for the nonmovant. Ibid. A court reviewing a summary judgment motion is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).

Further, the role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Civ. P. 7056; *see also Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 762-63 (1st Cir. 1994).

Where, as here, the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of its cause of action. The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under Fed. R. Civ. P. 50(a). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Provided it does so, the burden then shifts to the opposing party to adduce

evidence that establishes a genuine issue of material fact as to at least one essential element of the moving party's case.

"[S]ome alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

### b. Defamation Legal Standard

Defamation is a term for a legal claim arising from harm to a person's reputation, which is caused by a false statement of fact communicated to a third-party without privilege. Langadinos v. Bd. Of Trustees of Univ. of Massachusetts, 2013 U.S. Dist. LEXIS 141341, 2013 WL 5507042 (D. Mass. Sept. 30, 2013). To have a claim, a plaintiff is required to show that the false statement was "capable of damaging his or her reputation in the community and either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass 2004). Furthermore, "Defamation is the publication of material by one without a privilege to do so which ridicules or

treats the plaintiff with contempt." <u>Correllas v. Viveiros</u>, 572 N.E.2d 7, 10 (1991<u>),</u>

<u>citing Merrill v. Post Publishing Co.</u>, 197 Mass. 185, 191-192 (1908).

"Defamation is the publication of material by one without a privilege to do

so which ridicules or treats the plaintiff with contempt." <u>North Shore Pharmacy</u>

<u>Servs., Inc. v. Breslin Associates Consulting LLC</u>, 491 F. Supp. 2d 111, 124 (D. Mass.

2007) (<u>quoting Correllas v. Viveiros</u>, 410 Mass. 314, 319 (1991)). "To prove

defamation, the plaintiff must establish that the defendant was at fault for the

publication of a false statement regarding the plaintiff, capable of damaging the

plaintiff's reputation in the community, which either caused economic loss or is

actionable without proof of economic loss." <u>Dragonas v. School Comm. of Melrose</u>,

64 Mass. App. Ct. 429, 437 (2005) (internal quotation and citation omitted). "The

level of fault required varies between negligence (for statements concerning

private persons) and actual malice (for statements concerning public officials and

public figures)." <u>Ravnikar v. Bogojavlensky</u>, 438 Mass. 627, 630 (2003).

The elements of a defamation claim are: a false and defamatory

communication of and concerning the plaintiff which is published or shown to a

third party. <u>Carmack v. National R.R. Passenger Corp</u>, 486 F.Supp.2d 58 (D.Mass

2007). Additionally, The statement either caused the plaintiff economic loss or was

of the type that is actionable without proof of economic loss (defamation per se).

Oberg v. City of Taunton, 972 F.Supp.2d 174, 205 (D. Mass. 2013). Under state

common law, any libel is actionable per se. Sharratt v. Housing Innovations, Inc.,

365 Mass. 141 (Mass. 1974).

As such, a plaintiff does not need to plead or prove economic losses in order

to prevail on this claim. Additionally, Massachusetts recognizes libel per se when

determining whether a statement "could damage the plaintiff's reputation in the

community" -- which is part of the consideration of whether the statement is

defamatory. Albright v. Morton, 321 F. Supp. 2d 130 (D.Mass. 2004); Stone v. Essex

County Newspapers, Inc., 367 Mass. 849 (Mass. 1975). "Libel per se in this context

seems to encompass statements that charge the plaintiff with a crime, that allege

the plaintiff has certain diseases, or that may prejudice the plaintiff's profession or

business." Morton, 321 F. Supp. at note 3.

Recently, a Massachusetts Appellate court affirmed that false statements

that were published by a business owner about a local selectman who allegedly

used his position to advance his family's interests at the town's expense were

defamatory. Van Liew v. Eliopoulos, 478 Mass. 1105 (2017). A $2.1 million

defamation award was found for damage to reputation. Id. For these reasons and

based on the statements made by **defendant's** representatives, Plaintiff has clearly met his burden to show defamation.

    c. <u>**Plaintiff Has Met The Standard For Summary Judgment, Defendant Has Failed To Meet The Standard**</u>

In this case, it is specifically shown by the statements made that not only can clearly cause Plaintiff harm, but have done so. Additionally, Prima-facie evidence has been presented above, the MTA knew I was not the current COO of PV, the MTA knew I was not using disguises and misrepresenting myself, the MTA knew involved in right-wing undercover and organization, the MTA knew I was not a convicted felon but published on their website and possible with the NEA at conferences that I was all of the above.

Although it should not be required to proven, as a direct, legal and proximate result of the Defamation, Plaintiff have sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to harm the Plaintiff. Further, Plaintiff is not, by any definition, a "public figure" and as such, does not need to prove "actual malice". Additionally, as shown above, there have been numerous statements made,

against interest by representatives of Defendant, and parties speaking on their behalf, as well as Plaintiff himself, showing that Defendant has not only caused harm, but appeared to do so willingly, and even knowingly, which would meet the actual malice standard. Further, Plaintiff has sustained severe medical damages as well as professional, to the point that Defendant's claims should be completely dismissed, and Plaintiff's summary judgment granted, with a hearing set only for calculation of damages.

III. **CONCLUSION**

Given the above, Plaintiff posits the only reasonable conclusion for the court to find is in favor of Plaintiff for summary judgment, and against defendant for summary judgment.

Dated: May 4, 2022                                 Respectfully submitted,


By:   /s/ JOHN H. LANDINO
_____
JOHN H. LANDINO, PRO SE

JOHN H. LANDINO, PRO SE
124 Rumson Road
Rumson, NJ 07760
Telephone:  (201) 560-2500
Email:      john.landino@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| JOHN H. LANDINO<br><br>          Plaintiffs,<br><br>     v.<br><br>MASSACHUSSETTS TEACHERS ASSOCIATION, John Does 1-10<br><br>          Defendants. | DOCKET NO.: 1:20-cv-11392<br><br>**CIVIL ACTION**<br><br>**CERTIFICATE OF SERVICE FOR PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMEN PURSUANT TO FED. R. CIV. P. 56** |

CERTIFICATE OF SERVICE

I, John H. Landino, hereby certify that I caused a copy of the foregoing Pleadings

by email at the following addresses:

/s/ Carolyn M. Crowley
Kenneth M. Bello, BBO #036630
Carolyn M. Crowley, BBO #663616
BARCLAY DAMON LLP
160 Federal Street, Suite 1001
Boston, MA 02110

(617) 274-2900
kbello@barclaydamon.com
ccrowley@barclaydamon.com

<u>/s/ John H. Landino, Pro se</u>
124 Rumson Road
Rumson NJ, 07760
Phone: 201-560-2500
Email: john.landino@gmail.com

JOHN H. LANDINO, PRO SE
124 Rumson Road
Rumson, NJ 07760
Telephone:  (201) 560-2500
Email:        john.landino@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| JOHN H. LANDINO | DOCKET NO.: 1:20-cv-11392 |
| | **CIVIL ACTION** |
| Plaintiffs, | |
| v. | |
| MASSACHUSSETTS TEACHERS ASSOCIATION, John Does 1-10 | |
| Defendants. | |

RESPONSE TO DEFENDANT'S STATEMENT OF "UNDISPUTED" MATERIAL FACTS

1.      Admitted.

2.      Admitted.

3.      Admitted in part, denied in part. Admitted the NEA is a union, as to the

rest denied. A representative of the NEA, which was deposed, did not

substantiate these facts, and as such, they are not based on anyone's

personal knowledge and as such, must be denied.

4.      Admitted.

5.      Admitted.

6.      Denied. This is a misrepresentations and oversimplification of Project

Veritas. It misrepresents the statements made by Plaintiff and the other

individuals deposed.

7.      Denied. This is a misrepresentations and oversimplification of Project

Veritas. It misrepresents the statements made by Plaintiff and the other

individuals deposed.

8.      Denied. This is a misrepresentations and oversimplification of Project

Veritas. It misrepresents the statements made by Plaintiff and the other

individuals deposed.

9.      Denied. This is a misrepresentations and oversimplification of Project

Veritas. It misrepresents the statements made by Plaintiff and the other

individuals deposed.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Denied. This is an oversimplification of Mr. Landino's job description

during the short time he was at Project Veritas. It misrepresents the

statements made by Plaintiff and the other individuals deposed.

14.   Denied. As Plaintiff's counsel knows, a pardon was granted on May 10, 2016.

15.   Admitted in part, denied in part. Admitted a pardon was granted on May 10, 2016, as to the rest, denied.

16.   Admitted.

17.   Denied. This is a misrepresentations and oversimplification of the article about Project Veritas.

18.   Denied. This is a misrepresentations and oversimplification of the article about Project Veritas.

19.   Denied. This is a misrepresentations and oversimplification of the article about Project Veritas. Further, Plaintiff did **not** confirm the accuracy of these statements, and Plaintiff is grossly misrepresenting Plaintiff's statements.

20.   Denied. See deposition of Mr. Landino for the actual reason why, Defendant is lying in this statement.

21.   Admitted.

22.   Admitted.

23.   Admitted.

24. Admitted in part, denied in part. Just because there was no hyperlink does not mean the information was not falsely disseminated.

25. Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that.

26. Admitted.

27. Admitted.

28. Admitted.

29. Admitted.

30. Denied. It includes false information about Mr. Landino.

31. Admitted.

32. Admitted in part, denied in part. The Look Book **was** an attachment, but the reason for it being attached was not actually stated as claimed in this misleading statement.

33. Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that. Further, it is the height of hypocrisy for Defendants to be admitting to defamation here, because of **factual statements** that were admittedly reproduced about the NEA.

34. Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that.

35.    Admitted.

36.    Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that.

37.    Admitted.

38.    Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that.

39.    Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that.

40.    Denied. There are no facts anywhere that verify this misleading statement. Nothing in the statements cited actually say that. Further, this is implicitly admitting that the named individuals failed to do any due diligence before disseminating false information.

41.    Admitted in part, denied in part. Admitted Plaintiff's picture was included, as to the rest, denied.

42.    Admitted.

43.    Denied. The Look Book as a whole was designed to disparage all named individuals in it.

44.    Admitted.

45.    Admitted.

46.    Denied. Several of the statements were verifiably false, and had Defendant

done **any** due diligence, could have discovered the falsehood of the

statements.

47.    Denied. There are no facts anywhere that verify this misleading statement.

Nothing in the statements cited actually say that.

48.    Denied. There are no facts anywhere that verify this misleading statement.

Nothing in the statements cited actually say that.

49.    Denied. Plaintiff has not seen the entire list of parties present nor does he

know the entire population of individuals who received the Look Book. As

such, this statement has not, and cannot be verified.

50.    Denied. Please review Mr. Landino's deposition for the actual facts

regarding this matter, not the gross misrepresentation made here.

51.    Denied. There are no facts anywhere that verify this misleading statement.

Nothing in the statements cited actually say that.

52.    Admitted.

53.    Admitted.

54.    Admitted in part, denied in part. That data is only one method to know

who actually viewed the Look Book, and is not exhaustive proof that no

one saw it. Further, the fact they could have was more than sufficient.

55.   Denied. Plaintiff has not seen the entire list of the individual referenced

nor does he know the entire population of individuals who received the

Look Book. As such, this statement has not, and cannot be verified.

56.   Denied. There are no facts anywhere that verify this misleading statement.

Nothing in the statements cited actually say that.

57.   Denied. Please review Mr. Landino's deposition for the actual facts

regarding this matter, not the gross misrepresentation made here.

58.   Admitted. And this is, in large part, due to the actions taken by Defendant.

59.   Denied. Please review Mr. Landino's deposition for the actual facts

regarding this matter, not the gross misrepresentation made here.

60.   Admitted in part, denied in part. That was on reason, but not the only

thing impacting the business at that time.

61.   Denied. Please review Mr. Landino's deposition for the actual facts

regarding this matter, not the gross misrepresentation made here.

62.   Denied. Please review Mr. Landino's deposition for the actual facts

regarding this matter, not the gross misrepresentation made here.

63.   Denied. Please review Mr. Landino's deposition for the actual facts

regarding this matter, not the gross misrepresentation made here.

64.     Denied. Please review Mr. Landino's deposition for the actual facts

        regarding this matter, not the gross misrepresentation made here.

65.     Denied. Please review Mr. Landino's deposition for the actual facts

        regarding this matter, not the gross misrepresentation made here.

66.     Denied. Please review Mr. Landino's deposition for the actual facts

        regarding this matter, not the gross misrepresentation made here.

67.     Admitted.

68.     Denied. Please review Mr. Landino's deposition for the actual facts

        regarding this matter, not the gross misrepresentation made here.

69.     Denied. Defendant has already admitted they were disseminated and

        published.

70.     Denied. Please review Mr. Landino's deposition for the actual facts

        regarding this matter, not the gross misrepresentation made here.

71.     Denied. Please review Mr. Landino's deposition for the actual facts

        regarding this matter, not the gross misrepresentation made here.

/s/ John H. Landino, Pro se
124 Rumson Road
Rumson NJ, 07760
Phone: 201-560-2500
Email: john.landino@gmail.com
JOHN H. LANDINO, PRO SE
124 Rumson Road

Rumson, NJ 07760

Telephone:  (201) 560-2500

Email:      john.landino@gmail.com


**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| JOHN H. LANDINO | DOCKET NO.: 1:20-cv-11392 |
| Plaintiffs, | **CIVIL ACTION** |
| v. | |
| MASSACHUSSETTS TEACHERS ASSOCIATION, John Does 1-10 | |
| Defendants. | |

PLAINTIFF'S UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S  MOTION FOR SUMMARY JUDGMENT


1.   On March 7, 2014, Gawker published a libelous and erroneous article smearing the Plaintiff followed shortly by Gawker filing for Bankruptcy for losing a Defamation case. Gawker reported Plaintiff was a convicted felon for narcotics, behind on tens of thousands in taxes and child support – erroneously portraying Plaintiff as a repugnant individual.

2.   On the same day, Plaintiff was finally awarded full custody of his teenage daughters after a decade in Family Court trying to protect them.

3.      Plaintiff also owed no Child Support.

4.      Plaintiff's last day of work at PV was March 31, 2014, since this time until the

        present Plaintiff has had no contact, connection, association, or affiliation

        with PV nor any employee. Plaintiff is not a member or affiliated with any

        political entity or group.

5.      In 2015, PV recorded the President of the United Teachers of Wichita

        admitting to physically assaulting children in the classroom and being

        protected by the union.

6.      This incident too resulted in a PV lawsuit also involving Ms. Lauren Windsor

        and Democracy Partners (DP).

7.      In May of 2016, Plaintiff received a full pardon for his 1993 Unclassified

        Felony conviction in Connecticut.

8.      In May of 2016, Plaintiff petitioned the Gawker article authors via email to

        remove the defamatory content.

9.      The authors hired an attorney who refused to cooperate with my requests

        citing the company was still in Bankruptcy court.

10.     Democracy Partners (DP), American Family Voices (AFV) and Project Veritas

        Exposed (PVE) are powerful progressive liberal lobbying entities in

        Washington, D.C., whose clients include numerous teachers' unions. DP, AFV

and PVE combined to publish political opposition research, documents, and websites for their clients about PV's activities and employees.

11.    In 2017, DP filed a lawsuit against PV.

12.    Also, in the same year AFT filed a lawsuit against PV – both cases are ongoing at present.

13.    In 2018, PV won a lawsuit in Massachusetts District Court concerning the right to record public employees which would include Massachusetts teachers.

14.    At the end of 2018, Plaintiff finally paid back all tax arrears – all arrearage accumulated from Family Court post-divorce litigation from 2005-2018 costing Plaintiff over $250,000 in legal fees.

15.    DP and AFV had one of their comingled principles, Ms. Lauren Windsor, publish a website called Project Veritas Exposed - https://www.projectveritas.exposed/ approximately in June of 2018.

16.    PVE's website content focused solely on PV and its employees and investigators which also included a profile about the Plaintiff: https://www.projectveritas.exposed/john-landino as was the case through the filing of the complaint in this matter.

17.  As per Ms. Lauren Windsor's court testimony on September 9, 2020, she states the Plaintiff PVE profile was published June 26, 2018.

18.  PVE's Plaintiff's profile cites an erroneous and libelous Gawker article portraying Plaintiff as repugnant individual, deadbeat dad, and tax scofflaw.

19.  However, the profile included an "Update" stating Plaintiff was no longer a convicted felon as of May 10th, 2016 – this "update" was done on June 26, 2018.

20.  The PVE Plaintiff profile also states my employment at PV ended in 2014.

21.  In October 2018, DP and Ms. Lauren Windsor filed a complaint against PV with the Ohio Elections Commission which was dismissed.

22.  On June 21, 2019 the MTA published on their website a 15-page dossier about PV: https://massteachers.org/-/media/massteacher/files/conferences/nea-ra/project-veritas.pdf?la=en.

23.  The PV dossier had libelous and erroneous information about the Plaintiff along with his picture and hyperlinks to his Facebook profile and the libelous and knowingly false Gawker article.

24.  The URL which the MTA posted the full PV 15-page dossier contains a pathway to the stored file "massteacher" > "files" > "conferences" > "nea-ra" > "project-veritas" – this strongly indicates that the PV 15-page dossier

was shared with the NEA, which is "the largest labor union and the largest

white collar representative in the United States" and "it almost exclusively

supports the Democratic Party."

25. PV dossier untrue statement #1 – Plaintiff… "often uses disguises and

misrepresents themselves."

26. PV dossier untrue statement #2 – Plaintiff is the "COO" of PV.

27. PV dossier untrue statement #3 – Plaintiff is "People involved in right-wing

undercover operations and organizations."

28. PV dossier untrue statement #4 – Plaintiff is the "COO" of PV.

29. PV dossier untrue statement #5 – on page 12 Plaintiff name printed "John

Landino (COO, PV)" with text "COO" hyperlinked to the knowingly libelous

Gawker  article:  https://gawker.com/james-okeefe-employes-a-convicted-

felon-1538633934 6 page 12

30. The MTA, DP, AFV and Ms. Lauren Windsor all knew on or before June 26,

2018 that I was not a convicted felon but in an act of extreme malice and

retaliation they collectively conspired to linked my name to the erroneous

Gawker article which was still live on the internet for the public to see.

31.    The Gawker article was removed from the internet in its entirety by the new

        owner of the Gawker property on March 30, 2020 after Plaintiff threatened

        legal action.

32.    On April 29, 2020 Plaintiff filed a civil case against the MTA, DP, AFV and Ms.

        Lauren Windsor in Bergen County Superior Court of New Jersey.

33.    On July 17, 2020 Bergen County Superior Court dismissed the MTA from the

        suit for Diversity advising me to file against the MTA in Massachusetts.

34.    During the New Jersey court proceedings, the MTA admitted to posting the

        PV 15-page dossier on their website.

35.    MTA's counsel during oral argument admitted the MTA "had on its website

        a document created by an entity called Project Veritas Exposed."

36.    MTA's counsel then responded to an email from the Plaintiff after the

        hearing deceptively stating he was sure who gave and wrote the PV 15-page

        dossier to them.

37.    Now a common theme emerges – a conspiracy to defraud the Plaintiff and

        the courts.

38.    In the New Jersey court proceedings, Mr. Ryan Leach, Esq., Deputy General

        Counsel of the MTA submitted an AFFIDAVIT but deceptively omits the origin

and author of the PV 15-page dossier even though his counsel knows the author and origin.

39. Mr. Leach, Esq., appears to mislead the court again in #8 of his AFFIDAVIT stating the "MTA simply placed the Dossier on its website, which is generally accessible to its membership and the Public."

40. The troubling questions start to mount – the URL for the MTA's publishing of the PV 15-page dossier indicates it was used in coordination with its partner union, the NEA, at a conference(s) as well.

41. If the MTA and the NEA collectively distributed the PV 15-page dossier, then Mr. Leach, Esq., has committed perjury – a crime.

42.  This is precisely why the Plaintiff added John Does 1-10 as the deception from the defendant is wide ranging and material.

43. In the New Jersey court proceedings, Ms. Lauren Windsor of DP and AFV submitted an AFFIDAVIT where she also deceptively tells the court other than the "[Plaintiff PVE] profile…readily available online" they have never "published or disseminated any statement of any kind referencing Mr. Landino."

44. The MTA conspired with DP, AFV, Ms. Windsor and possibly the NEA and more to maliciously harm the Plaintiff as part of a larger political, ideological, and legal battle that has been raging continuously for over a decade.

45. Plaintiff's children attended high school in Massachusetts from 2017 through 2020 and were subjected to harm from the collective offenses intentionally committed to permanently destroy his reputation.

46. Internet search engines placed the MTA PV 15-page dossier in the top selections when searching "John Landino", creating irreparable harm to the Plaintiff, his family and business. Besides the strong possibility that the MTA distributed the PV 15-page dossier with the NEA, the website analytics for the dossier url will yield additional concrete data of the breadth of the distribution of their fraudulent statements about the Plaintiff.

47. This case had been going on for quite some time and several depositions have been taken.

48. While Defendant would certainly like the court to ignore the statements made ay many of those depositions, there are numerous statements that were that support Plaintiff's arguments so strongly, that summary judgment can be granted for Plaintiff at this time.

49.    The first deposition was that of Plaintiff's. (See Exhibit A – Deposition of John H. Landino.)

50.    Next Plaintiff took several depositions of representatives of Defendant, as well as one representative of the NEA. The first deposition was of Sarah Nathan. (See Exhibit B – Deposition of Sarah Nathan).

51.    The second was James Sacks. (See Exhibit C – Deposition of James Sacks).

52.    The third was Jessica Hiemenz-Woodbury (See Exhibit D – Deposition of Jessica Hiemenz-Woodbury).

53.    The fourth was Mary Gilgallon (See Exhibit E – Mary Gilgallon).

54.    The last was Kimberly Dominguez (See Exhibit F – Kimberly Dominguez).

55.    All of these depositions, as can be seen, shows that Defendant knowingly, willingly and intentionally defamed Plaintiff.

56.    Further, Plaintiff has suffered substantial physical harm as well. (See Exhibit G).

57.    Additionally, Plaint was pardoned as of May 10, 2016. (see Exhibit H).

58.    This was publicly verifiable information that Defendants simply failed to review, and instead chose to defame me and cause incalculable damage to Plaintiff, his family and his reputation.

59.   Finally, it is worth noting, and important for the court to understand, that

Plaintiff owed nothing to the IRS, and he also has had sole custody of his child

for years (See Exhibits I and J).

60.   These were also verifiable facts had Defendant chose to do so. They clearly

did not, as it did not fit their narrative.

/s/ John H. Landino, Pro se
124 Rumson Road
Rumson NJ, 07760
Phone: 201-560-2500
Email: john.landino@gmail.com
JOHN H. LANDINO, PRO SE
124 Rumson Road